NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0344n.06

No. 13-3742

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jun 22, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| TERRANCE WALTER, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| BENNIE KELLY, Warden, | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| Respondent-Appellee. | ) | |
| | ) | |
| | ) | |

BEFORE: CLAY, GIBBONS, and STRANCH, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. Terrance Walter appeals the denial of his

petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254. Following a jury trial, Walter

was convicted of aggravated murder, aggravated burglary, and felonious assault and sentenced to

a term of thirty-four (34) years to life imprisonment. Walter argues that he is entitled to *habeas*

relief on two grounds. First, he believes that the trial court's denial of his mid-trial request to

represent himself violated his Sixth Amendment right to self-representation. Second, he asserts

that the Ohio Court of Appeals unreasonably applied federal law in upholding his felonious

assault conviction because there was insufficient evidence to support the essential elements of

that charge. For the reasons that follow, we affirm the district court's denial of *habeas* relief.

I.

A.

On February 10, 2003, Samuel Sims Jr. ("Sims") was shot to death in his garage. Sims's son, Samuel Sims, III ("Tres"), who was nine years old at the time, was the only witness to the shooting. According to Tres's testimony, he and his father arrived home on the evening of February 10, 2003 around 9:00 pm. It was dark outside and there were no lights on outside the house. Sims parked his car in the "turn-around driveway in front of the house," exited the car and walked towards the garage with Tres "[s]omewhere behind [him]." Trial Tr. Vol II 366:17–19, 368:21, ECF No. 7-4. Sims then opened the garage door with a remote and entered the garage. Tres could not see his father at this point. After Sims entered the garage, a man wearing a black ski mask and carrying a gun walked from the backyard "to roughly the doorway of the garage" and fired several shots towards Sims. Trial Tr. Vol. IV 684:2–9, ECF No. 7-6. When the shots were fired, Tres was standing at "the corner of the house where . . . the side of the garage is," and after the shots were fired he "peeked around the corner" of the house and saw the masked man run by him "but not so close that [he] saw [Tres]." Trial Tr. Vol. II 370:20–371:20, ECF No. 7-4. Tres also testified that the shooter never looked at him.

Immediately after the shooting, Tres entered the garage and saw his father lying on the ground. Tres was "in a lot of shock" and he "didn't really know what was happening" so he shook his dad and told him to "quit playing." *Id.* at 373:17–21. He then called for his mother to come downstairs. She called the paramedics and told Tres to put pressure on Sims's wounds. After his mother told Tres that his father had died, he felt "[n]ot too good," he did not sleep in his own room again, and he thought about what happened "all the time." *Id.* at 377:15–378:4, 383:13–15. Following the shooting, Tres saw a psychologist for individual, hourly sessions once

a week for a year. While Tres testified that he "never actually thought at the time that [he] really needed" counseling, his mother thought he needed the therapy and that Tres "didn't seem to really grieve . . . [to] deal with it the way you would expect." *Id.* at 386:11–15, 429:14–18. After a year of counseling, the therapist referred Tres to group therapy because "he wasn't willing to open up and really participate in the one on one." *Id.* at 431:10–21. Tres did not participate in group therapy, but his mother believes that he still has "not really grieved and dealt with" his father's death and that "[b]ehaviorally . . . [Tres has] consistently gone down in school . . . [and] doesn't care about too many things." *Id.* at 432:24–432:9, 434:7–15.

B.

On August 22, 2006, Walter (also known as Terrance Ward)[1] and Antonio Campbell, were indicted for murdering Sims and for feloniously assaulting Tres. Campbell subsequently entered a plea agreement with the State, but Walter proceeded to trial.

On June 6, 2007, the jury in Walter's trial was selected. On June 7, 2007, the jury visited the crime scene and heard both sides' opening statements as well as testimony from the coroner, Nashall Sims, Sims's wife and Tres's mother, and Tres. At some point during Tres's testimony, the court held a sidebar where the court asked Thomas Shaughnessy, Walter's counsel, to "get [his] client under control." *Id.* at 394:7–11. Shaugnessy explained that Walter wanted him to "put Antonio Campbell and the defendant in front of [Tres] and have him say what's the most approximate height of the person who was there." *Id.* at 394:14–19. The court responded, "[w]e will not have this. If he wants to fire you, the both of you now and represent himself, I will be glad to have a hearing and entertain that request, but I'm not going to have him behaving in this fashion." *Id.* at 395:3–7. Shaughnessy then told the court that he was not going to question Tres further about the height of the shooter and "if the Court wants to break and inform [Walter] of

---

[1] In the trial transcript, Walter is referred to as Ward.

his ability to represent himself, that's fine." *Id.* at 395:14–18. The court declined to do so and told Shaughnessy to "control" his client. *Id.* at 395:19–23.

The third day of trial, June 8, 2007, began with Walter's request to speak with the court. Walter then proceeded to complain about his counsel's failure to get him a speedy trial, to which the court responded that it was "not going to hear . . . these kinds of claims" because Walter had "lawyers who are representing [him]" and that Walter "cannot represent [himself]." Trial Tr. Vol. III 501:12–23, ECF No. 7-5. In response Walter said, "Okay. I don't want to represent myself." *Id.* at 501:24–25. Walter and the court then engaged in a brief colloquy about the failure of Walter's counsel to question Tres further the previous day. The court eventually told Walter, "You could represent yourself, I suppose." *Id.* at 504:3. And after another brief colloquy, Walter stated, "I would like to represent myself," to which the court immediately responded, "I'm not going to permit that." *Id.* at 506:13–16. Walter indicated that he was "okay" with the court's decision "[a]s long as all this is on record." *Id.* at 506:17–18. The court denied Walter's request stating that it was "calculated to cause delay" and that the court was "not inclined to consider [Walter's] request at this juncture" because it was "well into the trial, to be permitted to represent himself." *Id.* at 507:24–508:2; Court Journal Entry 1, ECF No. 7-1.

## C.

Following trial, the jury convicted Walter of the aggravated murder of Sims, of the felonious assault of Tres, and of two counts of aggravated burglary. The trial court sentenced Walter to life in prison on the aggravated murder charge, without the possibility of parole for the first twenty years, plus six years for the firearm specification, a consecutive eight-year term for the felonious assault charge, and a concurrent five-year term for both aggravated burglary charges. The Ohio Court of Appeals vacated Walter's aggravated burglary convictions and

affirmed his other convictions. *State v. Walter*, No. 90196, 2008 WL 2687905 (Ohio Ct. App. July 10, 2008). The Court of Appeals denied Walter's motion to reopen his case, *State v. Walter*, No. 90196, 2009 WL 546203 (Ohio Ct. App. Mar. 3, 2009), and the Ohio Supreme Court denied Walter leave to appeal his remaining convictions.

On July 10, 2011, Walter filed a petition for a writ of *habeas corpus* in the district court for the Northern District of Ohio. The district court denied Walter's petition and declined to issue a certificate of appealability. Walter timely appealed, and this Court issued Walter a certificate of appealability.

## II.

This Court reviews *de novo* a district court's denial of *habeas* relief. *Nali v. Phillips*, 681 F.3d 837, 840 (6th Cir. 2012). Where a state court has adjudicated a claim on the merits, this court may grant *habeas* relief only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if it was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2). A state court's factual determinations "shall be presumed to be correct" unless the petitioner rebuts this presumption "by clear and convincing evidence." *Id.* at § 2254(e)(1).

### A. *Sixth Amendment Self-Representation*

Walter asserts that the state court violated his Sixth Amendment right to self-representation by denying his request to represent himself. Walter's request came at the beginning of the third day of trial,[2] after the jury had visited the crime scene and heard testimony

---

[2] The parties disagree over whether June 8, 2007, was the third day or fourth day of trial. The Ohio Court of Appeals noted that Walter's request was on the fourth day of trial, *Walter* 2008 WL 2687905 at *4, but on appeal Walter argues that June 5, 2007, was not the first day of trial because the court only disposed of pre-trial motions and other preliminary matters before the jury was empaneled. Whether Walter's request came on the third or fourth

from three people, including the only witness to the shooting, Tres Sims.  The trial court denied the request as untimely, noting that the trial had progressed too far to allow Walter to represent himself.  The Ohio Court of Appeals affirmed. *Walter*, 2008 WL 2687905, at *4.

The Sixth and Fourteenth Amendments "guarantee that a person brought to trial in any state or federal court must be afforded the right to the assistance of counsel before he can be validly convicted and punished by imprisonment."  *Martinez v. Court of Appeal of California, Fourth Appellate Dist.*, 528 U.S. 152, 154 (2000).  In *Faretta v. California*, the Supreme Court recognized that the Sixth and Fourteenth Amendments also provide an inverse right of criminal defendants to "proceed *without* counsel when [they] voluntarily and intelligently elect[] to do so." 422 U.S. 806, 807 (1975) (emphasis added).  In *Martinez*, the Court clarified that the right to self-representation was "not absolute." 528 U.S. at 161.  "Even at the trial level . . . the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer."  *Id.* at 162.  In light of the government's interests, "most courts" require criminal defendants to elect to conduct their own defense in "a timely manner." *Id.* at 162.

Before assessing the merits of Walter's claim, we first address an issue of characterization.  Walter, in an attempt to avoid AEDPA deference, argues that the state court's decision was the product of an inadequate state procedural rule.  *See* 28 U.S.C. § 2254(d)(1)–(2); *Rice v. White*, 660 F.3d 242, 252 (6th Cir. 2011) ("It is well settled that we may review *de novo* an exhausted federal claim that was not adjudicated on the merits in state court.").

The Ohio Court of Appeals affirmed the trial court's denial of Walter's self-representation request, reasoning:

---

day of trial is not dispositive.  It is undisputed that the request came several days into trial after the jury had heard testimony from several witnesses, including the only eye-witness to the shooting.

**[P19]** The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall * * * have the Assistance of Counsel for his defense." Similarly, the Ohio Constitution provides: "In any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel." Section 10, Article I, Ohio Constitution.

**[P20]** The United States Supreme Court has also recognized that the Sixth Amendment right to the assistance of counsel implicitly embodies a "correlative right to dispense with a lawyer's help." *Adams v. United States ex rel. McCann* (1942), 317 U.S. 269, 279, 63 S. Ct. 236, 87 L. Ed. 268. The court clarified this right to proceed without counsel in the landmark case of *Faretta v. California* (1975), 422 U.S. 806, 95 S. Ct. 2525, 45 L.Ed.2d 562. "Although not stated in the Amendment in so many words, the right to self-representation-to make one's own defense personally-is thus necessarily implied by the structure of the Amendment. The right to defend is given directly to the accused; for it is he who suffers the consequences if the defense fails."(Footnote omitted.) *Id.* at 819-820, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562. *Accord State v. Gibson* (1976), 45 Ohio St.2d 366, 345 N.E.2d 399, paragraph one of the syllabus ("a defendant in a state criminal trial has an independent constitutional right of self-representation and * * * may proceed to defend himself without counsel when he voluntarily, and knowingly and intelligently elects to do so.").

**[P21]** The right is not unlimited, however, as it must be explicit, unequivocal and timely made. *State v. Cassano*, 96 Ohio St.3d 94, 2002-Ohio-3751, 772 N.E.2d 81. In that case, the Court noted that Cassano's request was untimely because it was made three days before the trial was to start. *Id.*, citing to *United States v. Mackovich* (C.A.10, 2000), 209 F.3d 1227, 1237 (requests made six to ten days before trial "were merely a tactic for delay"); *United States v. George* (C.A.9, 1995), 56 F.3d 1078, 1084 (request untimely where it was made on eve of trial). *Accord State v. Halder, Cuyahoga App.* No. 87974, 2007-Ohio-5940 (request untimely where it was made four days before trial and only after the trial court had refused to disqualify trial counsel and appoint a third lawyer).

**[P 22]** In this matter, defendant made his request on the fourth day of trial. The trial court therefore properly determined that the request was not timely. The request was properly denied.

*Walter*, 2008 WL 2687905, at *4.

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). The presumption is rebuttable and may be overcome "when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 99–100. To determine whether the presumption has been overcome, this Court reads the state court decision "as a whole," looking to various factors including "the language used by the state court in its discussion of the claim at issue and the context of that discussion." *Barton v. Warden, S. Ohio Corr. Facility*, 786 F.3d 450, 460 (6th Cir. 2015) (citation omitted).

In denying Walter's request, the state appellate court cited *Faretta*, the Supreme Court's seminal case on the Sixth Amendment right to self-representation. *Walter*, 2008 WL 2687905, at *4. The court also relied on an Ohio Supreme Court case, *Cassano*, which itself relied on two cases from the Ninth and Tenth Circuits, for the proposition that Walter's right to represent himself was not unlimited and depended on the timing of his request. *Id.* (citing *United States v. Mackovich*, 209 F.3d 1227, 1237 (10th Cir. 2000); *United States v. George*, 56 F.3d 1078, 1084 (9th Cir. 1995)). The Ohio Court of Appeals expressly understood that it was deciding a federal constitutional question, and there is no indication that its decision rested solely on state law procedural principles. The court did not rely on an explicit Ohio procedural rule, nor did it purport to apply a procedural rule derived from state common law. *See Harris v. Reed*, 489 U.S. 255, 263 (1989) ("[A] procedural default does not bar consideration of a federal claim on either direct or *habeas* review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." (citation omitted)). Rather,

the court analyzed the merits of Walter's claim head on. It looked to analogous federal and state cases and determined that a request made several days into trial was an untimely assertion of the Sixth Amendment right to self-representation. *Walter*, 2008 WL 2687905, at *4.

Walter stresses that the only reason the trial and appellate courts rejected his claim is because it was deemed untimely, implying that timeliness is solely a procedural consideration. This argument ignores *Jones v. Bell*, 801 F.3d 556 (6th Cir. 2015). There, a state *habeas* petitioner raised the same argument Walter does here: that a state court decision rejecting a self-representation request on timeliness grounds was based solely on a *per se* state procedural bar. *Id.* at 566. In rejecting this argument, this Court concluded that "[i]t is not a state-court procedural rule regarding timing to invoke one's right to self-representation; it is a federal-law substantive rule—part of *Faretta*'s holding—about the limits of the self-representation right" and that "denying a self-representation request because of timing can be based on the nature of the *federal* right, not on the *state* procedure." *Id.*

The state courts' determination that Walter's request was untimely is founded on the substantive nature of his right to self-representation at that particular juncture of the trial, not on the fact that Walter had procedurally defaulted under state law. *See id.* ("[T]iming is part of a court's *substantive* analysis under *Faretta*."). Walter cannot overcome the presumption that the state court decided his federal claim on the merits, and therefore we proceed to review his Sixth Amendment claim under AEDPA's deferential standard.

Failing in his inadequate state law grounds argument, Walter contends that the state court's decision was an objectively unreasonable application of federal constitutional law. He argues that *Faretta* and *Martinez* require courts to explicitly balance a criminal defendant's

interest in self-representation and the government's interest in efficiency and integrity of the trial before rejecting a Sixth Amendment self-representation claim.

This Court may not grant federal *habeas* relief for claims subject to § 2254(d) unless the petitioner shows that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Richter*, 562 U.S. at 100.

The state court's denial of Walter's request was not contrary to clearly established federal law. In *Hill v. Curtin*, this court, sitting *en banc*, determined that "to the extent that *Faretta* addresses timeliness, as a matter of clearly established law it can *only* be read to require a court to grant a self-representation request when the request occurs weeks before trial." 792 F.3d 670, 678 (6th Cir. 2015) (emphasis added); *see also Stenson v. Lambert*, 504 F.3d 873, 884 (9th Cir. 2007) ("*Faretta* does not articulate a specific time frame pursuant to which a claim for self-representation qualifies as timely. . . . The Supreme Court has never held that *Faretta*'s 'weeks before trial' standard requires courts to grant requests for self-representation coming on the eve of trial").[3] The *Hill* court went on to note that "the Supreme Court has never defined the precise contours of *Faretta*'s timing element." 792 F.3d at 679. Likewise, the Supreme Court did not announce any clearly established law on timeliness in *Martinez*. The *Martinez* Court held only that the right to self-representation was "not absolute" and that it could be forfeited if not asserted in a timely manner. *Id.* (quoting *Martinez*, 528 U.S. at 161–62). Courts have consistently held that requests made during or on the eve of trial are not timely. *See id.* at 677–81 (denying *habeas* relief where self-representation request came on first day of trial); *United*

---

[3] While we cannot rely on circuit precedent as clearly established federal law for purposes of § 2254(d)(1), this court may "look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450–51 (2013) (per curiam).

*States v. Conteh*, 234 F. App'x. 374, 381 (6th Cir. 2007) (upholding denial of a motion for self-representation "filed after trial began"); *United States v. Pleasant*, 12 F. App'x 262, 266–67 (6th Cir. 2001) (upholding denial of motion for self-representation "on the day of trial with prospective jurors standing outside of the courtroom."); *Robards v. Rees*, 789 F.2d 379, 383–84 (6th Cir. 1986) (same).[4]

Nor was the state court decision an unreasonable application of federal law. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 410–11 (2000); *see Richter*, 562 U.S. at 102–03. A state court unreasonably applies federal law when its decision is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (citation omitted).

Walter suggests that, in light of *Faretta* and *Martinez*, it was unreasonable for the court to dismiss his request as untimely without first explicitly assessing his interests in self-representation and the government's competing interests in an efficient and reliable trial. This argument is unavailing.

First, the state court's consideration of Walter's request included consideration of the request's probable effect on the proceeding. The trial court briefly noted that it was denying Walter's request because it came "well into the trial," or in other words, at that juncture,

---

[4] Walter relies on *Moore v. Haviland*, 531 F.3d 393 (6th Cir. 2008) for the proposition that a midtrial invocation of the Sixth Amendment right to self-representation can be timely, but his reliance is misplaced. Not only does *Moore* not qualify as clearly established federal law under § 2254(d), it is also readily distinguishable. In *Moore*, this Court granted habeas relief where the court completely failed to exercise its discretion to rule on the request to proceed *pro se*. *Id.* at 403. Here, on the other hand, the court immediately addressed Walter's request and denied it as untimely.

allowing Walter to proceed *pro se* would have unduly disrupted the trial. Trial Tr. Vol. III 507:24–508:2, ECF No. 7-4. The state appellate court affirmed this finding, noting that Walter "made his request on the fourth day of trial. The trial court therefore properly determined that the request was not timely." *Walter*, 2008 WL 2687905 at *4.

The conclusion that a self-representation request was untimely implies that the request came at a point in time when the government's interests outweighed the defendant's. *See Martinez*, 528 U.S. at 162 ("Even at the trial level . . . the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer"); *Jones*, 801 F.3d at 566 ("Timing is part of a court's *substantive* analysis under *Faretta*."). While the state courts did not provide an overly detailed analysis of why Walter's request was denied, "[a] trial judge may fairly infer on the day of trial—as the jurors are on their way to the courtroom—that a defendant's last-minute decision to represent himself would cause delay, whether or not the defendant requests a continuance." *Hill*, 792 F.3d at 681. Here, the request came not on the first day of trial, but on the third day, after the jurors had heard testimony from three witnesses, including the only eye-witness to the crime.

Second, *Faretta* and *Martinez* shed little light on the existence of Walter's proposed structural requirement. *Faretta*, while identifying a defendant's constitutional interest in acting as his own lawyer, says nothing of the competing interests implicated by a defendant's request to proceed without counsel. *See* 422 U.S. 806. While *Martinez* recognized that a self-representation request involves "the government's interest in ensuring the integrity and efficiency of the trial" and the defendant's interest in "acting as his own lawyer," 528 U.S. at 162, apart from this oblique reference, there is no requirement for courts to overtly weigh these interests. Far beyond disagreeing, fair-minded jurists would search Supreme Court precedent in

vain for any clearly established requirement to explicitly weigh the government's and the defendant's interests at the time a Sixth Amendment self-representation request is made. It would be incongruent with AEDPA's deferential scheme of review to fault the state court for failing to do something it had no clearly established obligation to do.

### B.       *Sufficiency of the Evidence*

Walter next asserts that no rational trier of fact could have convicted him of feloniously assaulting Tres and that it was an unreasonable application of federal law for the Ohio Court of Appeals to deny his sufficiency of the evidence claim.

In assessing a sufficiency of the evidence claim, the key question is whether "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "[T]he *Jackson v. Virginia* standard is so demanding that '[a] defendant who challenges the sufficiency of the evidence to sustain his conviction faces a nearly insurmountable hurdle.'" *Id.* at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

Ohio defines felonious assault as follows:

> No person shall knowingly do either of the following:
>
> > (1) Cause serious physical harm to another or to another's unborn;
> >
> > (2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordinance.

Ohio Rev. Code § 2903.11(A)(1)–(2). Walter was indicted under Section 2903.11(A)(1), on the theory that Tres suffered severe psychological injuries as a result of seeing his father murdered. To convict Walter of felonious assault under Section 2903.11(A)(1), the State had to prove

beyond a reasonable doubt that Tres suffered "serious physical harm" and that Walter knowingly caused this harm. Section 2901.01(A)(5)(a) defines "serious physical harm" to include "any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment." Knowingly is defined as follows:

> A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist.

Ohio Rev. Code § 2901.22(B). Walter takes issue with the sufficiency of the State's evidence on both elements.

### 1.     *Serious Physical Harm*

Walter asserts that the evidence adduced at trial was insufficient to lead any rational trier of fact to the conclusion that Tres suffered serious physical harm within the meaning of Ohio Revised Code Section 2901.01(A)(5)(a). Of particular relevance to this claim is trial testimony that Tres was "in a lot of shock" following the shooting and "didn't really know what was happening," that Tres thought about the shooting "[a]ll the time," that Tres's mother believed he needed counseling and had not properly processed the shooting, that Tres had one-on-one, weekly sessions with a child psychologist for about a year, and that "behaviorally . . . [Tres has] consistently gone down in school . . . [and] doesn't care about too many things." Trial Tr. Vol II, 386:11–15, 429:14–18, 431:10–21, 432:24–432:9, 434:7–15, ECF No. 7-4.

The Ohio Court of Appeals affirmed Walter's conviction for felonious assault, but in doing so, it ignored the State's psychological injury theory, and instead mistakenly applied another provision of Ohio's felonious assault statute, Section 2903.11(A)(2), which provides that no person shall "[c]ause or attempt to cause serious physical harm to another . . . by means of a

deadly weapon or dangerous ordnance." *Walter*, 2008 WL 2687905, at *7. The court did not address Walter's claim that there was insufficient evidence to prove that Tres suffered "serious physical harm." *Id.* Thus, we look to the state trial court's denial of Walter's motion for acquittal as the last reasoned state-court opinion on this issue. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) ("[W]here there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.")

When there has been a reasoned state court decision on the merits, we do not review sufficiency of the evidence claims *de novo*. Rather "the law commands deference at two levels. . . . First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the [state court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA." *Lafler*, 658 F.3d at 531 (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)). In other words, it is not our duty to determine whether any rational trier of fact could have found that Walter committed the essential elements of felonious assault beyond a reasonable doubt. Rather, we analyze whether, in considering the jury's verdict, the last reasoned state court decision applied *Jackson*'s deferential standard unreasonably.

The trial court called this a "close question," but ultimately denied Walter's motion. Trial Tr. Vol. VII 1345:9–25, ECF No. 7-9. The court noted that there was no evidence of a distinct mental illness, but that it was arguable that the trial evidence supported a finding that Tres suffered from "a condition of such gravity as would normally require prolonged psychiatric treatment." *Id.* at 1345:15–20. The court pointed out that "prolonged" was not defined in § 2901.01(A)(5)(a) but ultimately ruled that a reasonable jury could "conclude that a year of

psychiatric counseling may be prolonged or may meet the definition of prolonged." *Id.* at 1345:21–25.

While this is, as the trial court surmised, a close question, we do not believe that the trial court's decision was an unreasonable application of *Jackson*. According to Walter, the evidence adduced at trial provides no basis for a rational trier of fact to conclude that Tres suffered from a condition so grave "as would normally require hospitalization or prolonged psychiatric treatment." CA 6 R. 53, Pet'r Br. at 57 (quoting Ohio Rev. Code § 2901.11(A)(5)(a). Walter cites multiple Ohio cases where courts upheld felonious assault convictions based on expert testimony from psychiatrists about the specific mental illnesses suffered by the victims. *See State v. Carpenter*, No. 94709 2011 WL 285837, at *2–3 (Ohio App. Jan. 20, 2011); *State v. Cooper*, 743 N.E.2d 427 (Ohio Ct. App. 2000); *State v. Hodges*, 669 N.E.2d 256 (Ohio Ct. App. 1995). But the Ohio Court of Appeals has also affirmed an aggravated robbery[5] conviction under circumstances similar to the present case. *See State v. Ridgeway*, No. 82713, 2004 WL 229520 at *2 (Ohio Ct. App. Feb. 5, 2004). In *Ridgeway*, no medical experts testified but the victim testified that "she [had] been diagnosed with post-traumatic stress and [had] been receiving treatment for her mental condition by a psychologist once a week as a result of the incident." *Id.* at *2.

Unlike the victim in *Ridgeway* who suffered from PTSD, Tres's specific condition(s) was not identified at trial. But it does not appear that the state was required to do so. Section 2901.01(A)(5)(a) defines "mental illness or condition" only in relation to the type of treatment normally required and the length of time treatment is typically necessary. Apart from this, the term is undefined. As the trial court pointed out, the jury was free to find that Tres suffered from a condition within the definition of the statute. Tres visited a therapist for about a

---

[5] "Serious physical harm" is an element of aggravated robbery. Ohio Rev. Code § 2911.01(A)(3)

year, and at the conclusion of those sessions, the therapist suggested even more therapy. Taking the evidence in the light most favorable to the prosecution, this evidence is more than enough to persuade a rational trier of fact that Tres suffered "serious physical harm."

Moreover, in affirming the jury's finding, the trial court was defining what qualified as "serious physical harm" under Section 2901.11(A)(5)(a). "State law means what state courts say it means" and "[w]hen a state court enters or affirms a conviction, it is saying that the evidence satisfies the legal norms." *Sanford v. Yukins*, 288 F.3d 855, 860 (6th Cir. 2002) (quoting *Bates v. McCaughtry*, 934 F.2d 99, 102 (7th Cir. 1991)). Viewed this way, Walter's claim amounts to an argument that the "state court misunderstood the substantive requirements of state law" and such claims are beyond the reach of federal *habeas* courts. *Id.*

### 2. Knowingly

Walter next asserts that because he never pointed or fired the gun in Tres's direction, it was unreasonable to find that he knowingly assaulted Tres. In making this argument, Walter relies heavily on *Nash v. Eberlin*, a case where this Court granted *habeas* relief and overturned a conviction for felonious assault under Ohio Revised Code Section 2903.11(A)(2). 258 F. App'x 761, 766 (6th Cir. 2007). There, we recognized that, under Section 2903.11(A)(2), "the act of pointing a gun at someone, without further evidence of the actor's intention, is not sufficient evidence for a felonious assault conviction." *Id.* (citing *State v. Brooks*, 542 N.E.2d 636, 642 (Ohio 1989)). The court further concluded that:

> [i]f there was insufficient evidence of felonious assault in such cases where a gun was pointed at someone, then the Ohio Court of Appeals could not reasonably determine that a rational trier of fact could have found beyond a reasonable doubt that a felonious assault was committed in this case, in which the evidence does not indicate that the gun was pointed at anyone.

*Id.* Walter also relies on *State v. Mills*, where the defendant's conviction under Section 2903.11(A)(2) was overturned. 582 N.E.2d 972 (Ohio 1992). In *Mills*, the alleged victim, a bank employee, was "not in the line of fire when the gunman entered [the bank] and hid underneath her desk during the remainder of the robbery." *Id.* at 984. The Ohio Supreme Court found that the record was "insufficient to support the finding that [the defendant] knowingly attempted to physically harm [the victim]." *Id.* On the strength of *Nash*, *Mills*, and other Ohio state cases, Walter discerns a rule: a "defendant does not 'knowingly' cause the mental variant of 'serious physical harm' in violation of Section 2903.11(A)(1) unless he fires a weapon in the direction of an intended victim or a bystander." CA6, R. 53, Appellant Br. at 50, 61. Based on this rule, Walter argues that the Ohio Court of Appeals's application of *Jackson* was unreasonable because "there was no evidence that a shot was fired in the direction of the alleged victim" as required by Ohio case law on felonious assault. *Id.* at 61.

The major problem with Walter's theory is that *Mills*, *Nash*, and the state cases *Nash* analyzed all dealt with convictions under Section 2903.11(A)(2), not (A)(1). Under (A)(2), the use of a "deadly weapon or dangerous ordnance" is required. Convictions under (A)(1), on the other hand, require no such means. "Nothing in the language of R.C. 2903.11(A)(1) indicates a legislative intent to limit the scope of the statute to cases where the 'serious physical harm' to the victim results from a battery." *State v. Elliott*, 663 N.E.2d 412, 415 (Ohio Ct. App. 1995); *see also Cooper*, 743 N.E.2d at 434 ("Not only may a person commit felonious assault by perpetrating an act causing mental illness, but a person may commit felonious assault when his or her failure to act causes mental illness.") The state's theory in this case was not that Walter's use of the gun to shoot Sims also harmed Tres, but rather that killing Sims in front of Tres caused

Tres serious psychological harm.[6] *See Cooper*, 743 N.E.2d at 434 ("It is clear that a defendant may knowingly cause a person to suffer mental illness constituting the 'serious physical harm' necessary for a conviction of felonious assault under R.C. 2903.11(A)(1) by perpetrating a single act . . . ."). It does not matter that Walter never threatened Tres with the gun or never fired a shot in his direction; all that matters is whether any rational jury could have found that Walter acted knowingly.

Walter's decision to focus on 2903.11(A)(2) is understandable given the Ohio Court of Appeals's emphasis on that portion of the statute. *See Walter*, 2008 WL 2687905, at *7. As will be discussed in more detail below, the court erroneously assumed that Tres was in the garage when his father was shot, which led it to rely on Ohio case law upholding assault convictions under 2903.11(A)(2), not (A)(1), where defendants knowingly fired shots into rooms occupied by multiple persons. *Id.* (citing *State v. Lee*, No. 97APA12-1629, 1998 WL 614608, at *1–*6 (Ohio Ct. App. Sept. 3, 1998)). Based on this reasoning, the Court of Appeals concluded that, because Tres was in close proximity to Sims when Walter shot Sims, Walter knowingly assaulted Tres. *Id.* The Ohio Court of Appeals affirmed Walter's felonious assault conviction based on an unreasonable determination of the facts, and, thus, we review this portion of Walter's sufficiency of the evidence claim *de novo*.

We must first determine whether there was sufficient evidence that Walter knew Tres was present when he murdered Sims. Tres testified that the masked shooter never looked at him, that when his father was shot, he was standing at "the corner of the house where . . . the side of the garage is," and that after his father was shot he "peeked around the corner" of the house and saw a masked man run by him "but not so close that [he] saw [Tres]." Trial Tr. Vol. II 371:1–

---

[6] On appeal the State maintains the same theory: "Walter . . . caused Tres serious physical harm—the trauma of witnessing the murder of his father . . . of showing his mother where his father lay and putting pressure on the wounds." CA6, R. 56, Appellee Br. at 38.

372:24, 401: 10–16, 403:14–22. The state asserts that Walter "admitted that he had shot a man in front of his child." CA6, R. 56 Appellee Br. at 44. The state's position is based on the testimony of Carlos Williams who stated that he asked Walter whether he "[shot] somebody in front of their kid" to which Walter responded "I had to do what I had to do, and I shot the guy." Trial Tr. Vol. IV 1348:8–25, ECF No. 7-6. "[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution." *Jackson*, 443 U.S. at 326. While the state's case on this point was thin, we conclude that a rational trier of fact could have found that Walter knew Tres was there.[7]

The question then becomes whether a rational jury could find that Walter was aware that his conduct of shooting Sims would probably cause Tres serious psychological harm. The facts of this case are similar to *Elliott*. 663 N.E.2d 412. There, the defendant was charged with feloniously assaulting his six-year-old son after he murdered his wife, the child's mother, and left her dead body in the kitchen. *Id.* at 413. The defendant's son was asleep in another room and did not discover his mother's body until the next morning. *Id.* at 413, 417. The state prosecuted Elliott for felonious assault on the theory his "failure to act to prevent [the child] from discovering his mother's body . . . resulted in serious physical harm to Eddie." *Id.* at 415. The Ohio Court of Appeals affirmed the defendant's felonious assault conviction based on his omission, but the court premised liability, in part, on defendant's parental duty to protect his child and his failure to do so by removing his wife's body. *Id.* In this case, unlike in *Elliott*, Walter had no parental duty to Tres. But here, unlike in *Elliott*, liability is premised on an affirmative act, not on an omission.

---

[7] Walter concedes, on appeal, that the evidence can be construed this way. *See* CA6, R. 53, Appellant Br. at 65 n.16 ("Walter's response [to Carols Williams' question], at most suggests that he was aware of the boy's presence generally.").

The *Elliott* court noted that the "much more difficult question" was whether there was sufficient evidence to allow a rational jury to find that defendant was "aware [his son] would probably suffer 'serious physical harm'" upon discovering his mother's body. *Id.* at 417. The court stated that the defendant's state of mind could be "determined from reasonable inferences arising from the evidence," *id.* (citation omitted), and ultimately concluded:

> In the final analysis, we can envision few things more traumatic to a six-year-old child than to find his murdered mother's body in a pool of blood, *unless it be to see the actual murder*; if the circumstances of this case do not allow the inference that defendant knew serious physical harm in the form of mental injury to Eddie was the probable result of defendant's failure to act, we have difficulty imagining what circumstances would. While these facts do not mandate a conclusion that defendant acted knowingly, the evidence was sufficient to allow the trial judge to consider the issue. Thus, the trial court did not err in overruling defendant's [motion for acquittal].

*Id.* at 418 (emphasis added). In light of *Elliott*, we conclude that a rational jury could have found that when Walter shot Sims he was aware that it would likely cause Tres serious psychological harm, within the meaning of 2903.11(A)(1).

Relatedly, Walter argues that the Ohio Court of Appeals's denial of his sufficiency of the evidence claim rested on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). In affirming Walter's conviction, the Ohio Court of Appeals made the following factual findings:

> According to Tres, his father opened the garage with the remote opener. His father got out of the car and Tres followed him as he entered the garage. Tres then observed someone dressed in black with a ski mask run towards them from the back of the house. Tres testified that he saw the individual shoot into the garage then flee.

*Walter*, 2008 WL 2687905, at *1. The Court of Appeals also relied on *Lee*, which held that "firing into a bedroom supports an inference that the assailant was aware of the circumstances of

his action, and knowingly caused or attempted to cause harm to the occupants therein." *Id.* at *7–*8 (citing *Lee*, 1998 WL 614608, at *4). The court found *Lee*'s reasoning applicable to Walter's case, noting that "the evidence demonstrated that defendant opened fire into the garage and that Tres was behind his father and in close proximity to the areas where spent rounds and a casing was recovered." *Id.* at *8. Based on its factual findings and its reliance on *Lee*, it appears that the Ohio Court of Appeals assumed that Tres was in the garage when his father was shot. There is no support in the record for this assumption. Tres testified that when his father was shot, he was standing at "the corner of the house where . . . the side of the garage is," and that after his father was shot he "peeked around the corner" of the house and saw a masked man run by him "but not so close that [he] saw [Tres]." Trial Tr. Vol. II 371:1–372:24, 401: 13–16. Tres's testimony is uncontroverted and provides "clear and convincing" evidence that he was not in the garage. 28 U.S.C. § 2254(e)(1). It was unreasonable for the Ohio Court of Appeals to assume otherwise. The state court's error, however, is not one upon which *habeas* relief may be grounded because it did not result in a constitutional error. State prisoners are entitled to a writ of *habeas corpus* only if they are in custody in violation of the Constitution or laws or treaties of the United States. *Id.* at § 2254(a). Section 2254(d)(2) "does not repeal the command of § 2254(a)." *Wilson v. Corcoran*, 562 U.S. 1, 5–6 (2010). As our preceding discussion shows, a rational trier of fact could have found that Walter violated Ohio's felonious assault statute. Therefore, the state court's factual error, unreasonable though it was, is not grounds for relief.

III.

For the foregoing reasons, we affirm the district court's denial of *habeas* relief.